**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CLEVE S. BRADFORD, | ) | |
| | ) | Case No. 16 C 8112 |
| Plaintiff, | ) | |
| | ) | Hon. Jorge L. Alonso |
| v. | ) | |
| | ) | Magistrate Judge Jeffrey Cummings |
| WEXFORD HEALTH SOURCES, INC., *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Cleve S. Bradford, a prisoner in the Illinois Department of Corrections ("IDOC"), filed a two-count complaint against Defendants Dr. F.A. Craig ("Craig"), Dr. J.F. Mitchell ("Mitchell"), Dr. Saleh Obaisi ("Obaisi"), and Wexford Health Sources, Inc. ("Wexford"), pursuant to 42 U.S.C. § 1983, alleging defendants violated his Eighth Amendment rights in how they treated him for an impacted wisdom tooth.[1] All defendants moved for summary judgment, and thereafter, Bradford filed a motion to dismiss Obaisi as a defendant, which the Court granted with prejudice. (ECF Nos. 166 and 180.) The Court now addresses the remaining motions. For the reasons that follow, the Court grants Defendants' motions [135, 141, and 145] in their entirety.

## BACKGROUND

The Court takes the facts from the parties' Local Rule 56.1 statements and supporting exhibits. The Court does not provide an exhaustive summary of the services and dental care that defendants provided plaintiff but instead includes only facts which are relevant to the issues raised by the parties.

---

[1] Both Obaisi and Craig have died since Bradford filed suit. Bradford substituted Obaisi for Ghaliah Obaisi, who is the independent executor of Obaisi's estate. (ECF Nos. 92, 93, and 94.) Bradford substituted Craig for Shirley T. Craig, who is the special representative of Craig's estate. (ECF No. 122, 129, and 131.)

Cleve Bradford is an inmate at IDOC's Stateville Correctional Center and alleges the dental treatment he received at Stateville from December 2014 through March 2015 violated his constitutional rights. (Wexford's LR 56.1 SOF, ECF No. 156 at ¶ 1.) Defendant Wexford is a private corporation that contracted with the IDOC to provide health services, including dental care, to inmates at Stateville during the relevant time period. (*Id.* at ¶ 2)

1.      **Relevant Wexford Policies**

Wexford's contract with IDOC provides that Wexford will provide dental care services on-site at Stateville as well as off-site, if necessary. (Wexford's Resp., ECF No. 175 at ¶¶ 26-28.) Wexford has established dental policies, which among other things, provide procedures for how to schedule an inmate to receive dental care. (*See generally* Pl.'s LR 56.1 Resp., ECF No. 170, Ex. 2.) In a process referred to as "sick call," inmates seeking dental treatment submit medical request forms so that their needs can be prioritized and treatment scheduled accordingly. (*Id.*, Ex. 2 at 76.) As discussed further below, the record is unclear whether there is any Wexford policy that directly addresses how and by whom the medical request forms are actually collected and delivered to staff responsible for reviewing and prioritizing the requests. In relevant part, Wexford's contract with IDOC states that Wexford is to "conduct sick call in compliance with [IDOC] Administrative Directives" (ECF No. 175 at ¶ 29), but it is unclear whether there is any IDOC directive (or any other Wexford policy) that specifically addresses standards for collecting inmate medical request forms. The parties dispute to what extent, if any, Wexford staff is involved in collecting medical request forms and ensuring they are reviewed in a timely fashion. (*Id.* at ¶ 1.)

Once request forms are submitted, the policies state that the request, along with the inmate's dental chart and medical history, should be reviewed to determine the priority level of the request "according to site-specific written protocol." (*Id.* at ¶ 4.) This review is a triage process

performed by IDOC nursing staff; the parties appear to also dispute what role, if any, Wexford staff has in prioritizing cases. (*Id.* at ¶ 1.)

The Wexford policies specifically state that "emergency care receives the top priority" and care for inmates with dental emergencies "shall be available at all times" and are to be "scheduled before anyone else on a daily clinical basis." (*Id.* at ¶ 3.) Further, the dental policies characterize "relief of severe pain" as a condition requiring emergency dental care. (ECF No. 170, Ex. 2 at 76.) However, Wexford's policies also state that they "do not supersede any contracted entity policy," or in other words, Wexford defers to IDOC policies. (ECF No. 175 at ¶ 5.) IDOC policy—specifically IDOC Administrative Directive 04.03.102—states that any inmate experiencing a dental emergency "shall receive a dental examination no later than the next working day after the emergency occurs." (*Id.* at ¶ 6.)

## 2. Bradford's Treatment

In December 2014, Bradford began experiencing pain in his lower left wisdom tooth. (Craig's LR 56.1 Resp., ECF No. 173 at ¶ 1.) Bradford claims he filed a medical request form on or about December 11, 2014, describing his severe pain and asking for treatment, and because he had not received any response by late December, he filed a second medical request form reiterating his complaints. (*Id.* at ¶¶ 2-3.) Although the parties dispute when and if Bradford submitted both medical request forms, either a Wexford or IDOC employee had received and reviewed at least one of Bradford's requests by December 29, 2014, and scheduled Bradford for a dental examination on January 5, 2015. (*See Id.* at ¶¶ 2-4; *see also* ECF No. 156, Ex. 2 at IDOC000259.)

On January 5, 2015, Dr. Mary Cavitt, who was a dentist at Stateville and is not named as a defendant, examined Bradford and determined that his lower left wisdom tooth was impacted and needed to be extracted. (ECF No. 173 at ¶¶ 4-5.) Cavitt characterized Bradford's condition as

"urgent" (*Id.* at ¶¶ 5-6), and she arranged for Bradford to see Defendant Dr. F.A. Craig on February 10, 2015, to have the wisdom tooth examined and extracted. (ECF No. 170 at ¶ 9.) Prior to that appointment, Bradford submitted another written medical request stating he would like to be seen again as soon as possible because he was still experiencing extreme pain. (ECF No. 173 at ¶ 7.) Although the medical request was received and reviewed by February 6, 2015, Bradford did not receive any further treatment until February 10, 2015. (*Id.* at ¶ 7-8.) Bradford is critical of the delays between when he reported his severe pain and when he received treatment; Bradford offers the expert testimony of Dr. Donald Sauter, who opines that the kind of pain Bradford reported constituted an emergency and that the delays described above fall "well below accepted standards of care and demonstrate[] an indifference to a serious medical need." (ECF No. 170, Ex. 1 at 3-5.)

### 3. Dr. Craig

Defendant Dr. Craig, a Wexford employee, was an oral and maxillofacial surgeon located at Stateville. (Craig's LR 56.1 SOF, ECF No. 154 at ¶ 4.) On February 10, 2015, Craig saw Bradford as scheduled. (Pl.'s LR 56.1 Resp., ECF No. 161 at ¶ 8.) Craig examined Bradford and diagnosed his wisdom tooth as having a "mesioangular impaction," meaning it was tilted in a certain direction. (*Id.* at ¶ 28.) Craig performed the tooth extraction. (*Id.* at ¶ 9.) Craig provided Bradford with a single shot of local anesthesia prior to extracting his wisdom tooth (ECF No. 173 at ¶ 36), and the parties agree that it was acceptable to use local anesthesia, i.e., it was not required that Bradford be sedated. (ECF No. 161 at ¶¶ 16 and 18.) Nonetheless, Bradford testified that the extraction was very painful and "very rough." (ECF No. 173 at ¶ 31.) Following the procedure, Craig told Bradford that the root tips of his wisdom tooth had fractured during the procedure and remained in his jaw, and Craig did not attempt to remove the root tips. (*See* ECF No. 161 at ¶ 10; *see also* ECF No. 173 at ¶¶ 13-14.) The parties agree that immediately removing root tips entails

certain risks while leaving them in generally does not cause complications, and as such, Bradford is not critical of Craig's decision to leave the root tips in his mouth after they fractured. (ECF No. 161 at ¶¶ 53-56.) Craig prescribed Bradford Motrin 400 mg for the pain. (*Id.* at ¶ 9.) After the February 10 visit, Craig did not provide any further treatment for Bradford nor was Craig made aware of the post-extraction treatment that Bradford received or Bradford's complaints of post-extraction pain. (*Id.* at ¶ 11.)

Craig contends that his treatment conformed to the applicable standard of care in all respects. (*Id.* at ¶ 14.) Bradford responds that Craig's treatment was deficient in several ways. In particular, relying on the expert testimony of Dr. Sauter, Bradford claims that Craig fell below the applicable standard of care in that: (1) Craig failed to document an adequate "intra oral exam"; (2) Craig failed to correctly diagnose the type of wisdom tooth impaction; (3) Craig failed to properly remove Bradford's wisdom tooth; and (4) Craig failed to properly administer local anesthetic during the tooth extraction procedure. (*Id.* at ¶ 14.)

### 4. Dr. Mitchell

Defendant Dr. J.F. Mitchell is a dentist who was employed by IDOC at Stateville during the relevant time period. (Mitchell's LR 56.1 SOF, ECF No. 143 at ¶ 2; *see also* ECF No. 154 at ¶ 5.) Although Mitchell treated Bradford on multiple occasions relating to his wisdom tooth, the parties agree only two appointments are relevant: February 17, 2015, and February 23, 2015. (Pl.'s LR 56.1 Resp., ECF No. 168 at ¶¶ 5-6.) On February 17, 2015, Bradford saw Mitchell "as an emergency" because Bradford again reported experiencing "severe pain" relating to his tooth. (Mitchell's LR 56.1 Resp., ECF No. 178 at ¶ 2.) During the appointment, Mitchell examined Bradford and observed Bradford had only a partial blood clot where his wisdom tooth had been extracted and, as a result, believed Bradford was suffering from a condition called "dry socket."

(*Id.* at ¶ 3.) Dry socket is a condition where the socket from which a tooth is extracted either never fully forms a blood clot or loses the blood clot early. (ECF No. 168, Ex. 2 at 46:2-20.) Because there is nothing covering the socket, which is full of nerve endings, dry socket is generally very painful. (*Id.*, Ex. 2 at 46:9-11.) During her examination, Mitchell also took x-rays of Bradford, which revealed the two retained root tips where Bradford's wisdom tooth had been extracted. (*Id.* at ¶ 22.) Mitchell determined the root tips were in the "mandibular nerve," which could be another cause of Bradford's pain. (ECF No. 173 at ¶¶ 16.) Based on her examination of Bradford, Mitchell determined the root tips should be surgically removed. (*Id.* at ¶¶ 18-19.)

After examining Bradford, Mitchell referred him to an outside oral surgeon "on an urgent basis" to have the root tips removed; Mitchell referred him to the outside surgeon, Dr. Glenn Scheive, because it would have taken about a month for Bradford to see a Stateville oral surgeon. (ECF No. 168 at ¶ 26.) Bradford was scheduled to see Dr. Scheive on February 26, 2015 to have the root tips removed.

Also at the February 17 appointment, Mitchell prescribed Methocarbamol 750 mg twice daily and ordered a diet of soft foods to treat Bradford's complaints of muscle pain and spasms. (*Id.* at ¶ 23.) To treat Bradford's dry socket, Mitchell placed a "ZOE pellet" in the extraction site, which Mitchell testified is aimed at reducing pain caused by dry socket. (ECF No. 143, Ex. D at 68:10-69:5.) Finally, to generally address Bradford's pain, Mitchell prescribed Motrin 400 mg and doubled the dosage that Craig had prescribed him, from one tablet to two tablets at least three times per day. (ECF No. 168 at ¶ 24.) This increased dosage came after Bradford told Mitchell that his current Motrin prescription was not effective. (ECF No. 143, Ex. C at 46:20-47:3.)

On February 23, 2015, Mitchell saw Bradford again and performed an oral examination. (ECF No. 170 at ¶ 55.) Mitchell determined that Bradford's "status was the same," i.e., that he

needed to have the root tips removed. (ECF No. 143, Ex. D at 75:9-13.) Mitchell prescribed

penicillin VK 500 mg, an antibiotic to address tissue inflammation Mitchell observed. (*See* ECF

No. 168 at ¶ 35; *see also* ECF No. 143, Ex. D at 77:18-78:4.) Mitchell did not prescribe any

additional pain medication on February 23, 2015 because the prescription for two tablets of Motrin

400 mg had not yet expired. (*Id.*, Ex. D at 78:5-17.) Bradford reported he was still experiencing

pain at the spot where his wisdom tooth had been removed, but Mitchell does not recall whether

Bradford said the Motrin was not helping alleviate his pain. (*Id.*, Ex. D at 76:4-78:23.) Mitchell

testified that had Bradford said the Motrin was not working, she would have prescribed something

different. (*Id.*, Ex. D at 78:24-79:11.) Bradford also testified that he told Mitchell he was still

experiencing pain during the February 23 visit. (*Id.*, Ex. C at 53:5-11.) Bradford testified that

Mitchell asked him if he needed any medication, and Bradford admitted that he did not ask for a

different pain killer or otherwise relate that the Motrin Mitchell had prescribed was ineffective.

(*Id.*, Ex. C at 56:24-55:14.)

Like Craig, Mitchell contends that her treatment was proper in all respects. Although there

is no dispute that Mitchell performed some type of examination on Bradford during each of his

visits, Bradford's expert Dr. Sauter concluded that Mitchell failed to document an adequate intra

oral exam. (ECF No. 178 at ¶ 11.) Bradford also criticizes Mitchell for not providing adequate

pain relief.

Regarding pain medication, Mitchell is limited to prescribing medications that are included

on a "formulary," which is a list of approved medications created by Wexford. (*See* ECF No. 168

at ¶¶ 39-41; *see also* ECF No. 143, Ex. D at 31:15-32:4.) Tylenol 3 is the strongest pain medication

listed on the formulary, and Mitchell could have prescribed Tylenol 3 to Bradford. (ECF No. 178

at ¶¶ 14-15.) Bradford, who admits he is not a doctor, believes that Tylenol 3 would have helped

better alleviate the pain he was experiencing following the extraction of his wisdom tooth than the Motrin he was prescribed. (ECF No. 168 at ¶¶ 10-11.) Mitchell testified that, in her opinion, the best medication to treat pain related to an impacted wisdom tooth is Motrin, which contains Ibuprofen. (*Id.* at ¶¶ 29-30.) Mitchell prefers Motrin to other medications because it promotes bleeding, controls inflammation, and controls pain. (*Id.* at ¶ 31.) Mitchell testified that Tylenol 3 is not as effective as Motrin in terms of pain management because Tylenol 3 "tends to just put the person to sleep." (ECF No. 143, Ex. D at 30:3-17.) Further, Mitchell testified that, based on her experience, Motrin is more effective at relieving pain associated with dry socket than Tylenol 3. (ECF No. 168, Ex. D at 46:20-47:6.) In relevant part, Bradford's expert, Dr. Sauter, testified that one table of Motrin 400 mg "may be too little" but agreed that two tablets of Motrin 400 mg could be effective. (*Id.*, Ex. 4 at 192:19-197:7.) Sauter further admits that different doctors have different preferences for pain medication. (ECF No. 161 at ¶ 47.)

On February 26, 2015, Dr. Scheive removed Bradford's root tips and afterwards, and at a follow-up appointment on March 9, 2015, Bradford reported that he was pain free and having no more issues related to his wisdom tooth. (ECF No. 168 at ¶ 38.)

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *See Wesbrook v. Ulrich*, 840 F.3d 388, 391 (7th Cir. 2016); *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014). At the summary-judgment stage, the court does not make credibility determinations, weigh evidence, or decide which inferences to draw from the facts; those are jury

functions. *See Gibbs v. Lomas*, 755 F.3d 529, 536 (7th Cir. 2014). But "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

"A party that does not bear the burden of persuasion [at trial] may move for summary judgment by showing—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)) (quotations omitted). If the moving party makes such a showing, "the nonmoving party bears the burden of production under Rule 56 to designate specific facts showing that there is a genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

## **DISCUSSION**

Section 1983 creates a cause of action against any person who, under color of state law, "subjects or causes to be subjected, any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Bradford brings claims against Defendants Craig and Mitchell, arguing they violated his Eighth Amendment rights because they were deliberately indifferent to his serious medical need (Count I).[2] Bradford brings a *Monell* claim against Defendant Wexford, arguing Wexford's policies and practices violated his Eighth Amendment rights in a number of ways (Count II). The Court addresses these two types of § 1983 claims in turn.

---

[2] In her brief, Mitchell also moves for summary judgment on Bradford's *Monell* claim as it applies to Mitchell. (*See* Mitchell's Memo. in Support, ECF No. 144 at 7-9; *see also* Mitchell's Reply, ECF No. 177 at 1.) However, the Court already dismissed Mitchell from the *Monell* claim in its ruling on the defendants' motions to dismiss. (ECF No. 87.) As such, the Court need not address Mitchell's arguments regarding the *Monell* claim.

## I.     Deliberate Indifference Claims

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). "[T]he Eighth Amendment safeguards the prisoner against a lack of medical care that may result in pain and suffering which no one suggests would serve any penological purpose." *Id*. (quotations and citations omitted). In the medical care context, "[p]rison officials violate the Eight Amendment's proscription against cruel and unusual punishment when they display deliberate indifference to serious medical needs of prisoners." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). To establish a "deliberate indifference" claim, a plaintiff must show (1) an objectively serious medical condition; and (2) an individual defendant's deliberate indifference to that condition. *Petties*, 836 F.3d at 728.

Regarding the first prong, the Seventh Circuit has observed that "dental care is one of the most important medical needs of inmates," *Board v. Farnham*, 394 F.3d 469, 480 (7th Cir. 2005), and an impacted wisdom tooth *can* qualify as an objectively serious medical condition. *See e.g., Maddox v. Jones*, 370 F. App'x. 716, 719 (7th Cir. 2010) (discussing issue and citing cases). The parties do not genuinely dispute that Bradford's impacted wisdom tooth along with its attendant complications (i.e., dry socket and retained root tips) constitute a serious medical condition, and Defendant Craig explicitly concedes this point for purposes of his motion for summary judgment. (Craig's Reply, ECF No. 174 at 2.)

The second prong examines a defendant's subjective state of mind and requires a plaintiff to prove the defendant "knows of and disregards an excessive risk to inmate health or safety." *Vance v. Peters*, 97 F.3d 987, 991-92 (7th Cir. 1996) (quoting *Farmer*, 511 U.S. at 837). Bradford does not need to show that Craig and Mitchell "intended harm or believed that harm would

occur…[b]ut showing mere negligence is not enough." *Petties*, 836 F.3d at 728 (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.")). "Neither medical malpractice nor mere disagreement with a doctor's medical judgment" is sufficient to establish deliberate indifference in violation of the Eighth Amendment. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). "Even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known—is insufficient to make out a claim." *Petties*, 836 F.3d at 728. Rather, a plaintiff must present evidence that allows for the reasonable inference that the defendant actually knew of a serious medical condition and disregarded it. "The requirement of subjective awareness stems from the Eighth Amendment's prohibition of cruel and unusual *punishment*; an *inadvertent* failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain." *Zaya v. Sood*, 836 F.3d 800, 804-05 (7th Cir. 2016) (quoting *Estelle*, 429 U.S. at 105).

Regarding Defendants Craig and Mitchell, Bradford does not accuse them of completely ignoring his impacted wisdom tooth nor does he accuse them of delaying treatment; rather, Craig and Mitchell are "accused of providing *inadequate* treatment…[and as such,] evaluating the subjective state-of-mind element can be difficult." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). Again, showing mere negligence—i.e., a "mistake in professional judgment"—is not enough to escape summary judgment. *Id*. The question is: does evidence exist "from which a reasonable jury could infer a [defendant] knew he was providing deficient treatment[?]" *Petties*, 836 F.3d at 726. The Seventh Circuit has offered several ways Bradford could make such a showing at the summary judgment stage:

> State-of-mind evidence sufficient to create a jury question might include [1] the obviousness of the risk from a particular course of medical treatment; [2] the defendant's persistence in a course of treatment known to be ineffective; or [3] proof that the defendant's treatment decision departed so radically from accepted

professional judgment, practice, or standards that a jury may reasonably infer that the decision was not based on professional judgment.

*Whiting*, 839 F.3d at 662-63 (citations and quotations omitted); *see also Petties*, 836 F.3d at 728-31 (discussing different theories upon which deliberate indifference has been found).

## A.    Dr. Craig

It is undisputed that Defendant Craig treated Bradford on one occasion, February 10, 2015. On that date, Craig examined Bradford, extracted his impacted wisdom tooth, and prescribed Bradford medications to prevent infection and to alleviate any post-surgery pain Bradford might experience. (ECF No. 161 at ¶¶ 8-10, 28.) Craig had no further contact with Bradford, nor was Craig given any updates on Bradford's condition. (ECF No. 161 at ¶ 11.) Relying on medical records and witness testimony, Craig argues there is insufficient evidence upon which a jury could find he was deliberately indifferent to Bradford's dental needs on February 10, 2015. In response, Bradford criticizes Craig's treatment in four ways: (1) Craig failed to document an adequate "intra oral exam"; (2) Craig improperly diagnosed the impaction type of Bradford's wisdom tooth; (3) Craig failed to remove Bradford's entire wisdom tooth; and (4) Craig failed to properly administer local anesthesia, which caused Bradford to suffer unnecessary pain during the extraction. (Pl.'s Resp., ECF No. 160 at 7-9.)[3] Bradford argues that these aspects of Craig's treatment allow for the inference that Craig was deliberately indifferent to Bradford's serious medical needs.

First, Bradford's argument regarding an "intra oral exam" cannot support a finding of deliberate indifference. As Bradford's expert, Dr. Donald Sauter, explains it, an intra oral exam is used to collect patient information to support a proper diagnosis, rule out certain causes of pain,

---

[3] Bradford does not argue that a jury could infer Craig's deliberate indifference from any other aspect of the treatment Craig provided. In particular, Bradford states he is not critical of Craig's decision to leave the root tips in after they broke during the procedure nor is he critical of the medications Craig prescribed him. (ECF No. 160 at 3.)

and choose the appropriate treatment plan. (*See* ECF No. 154, Ex. 8 at 214:22-216:5; *see also* ECF No. 178 at ¶¶ 12-13.) The parties agree that "severe pain can indicate things that can be life threatening," like an infection or a tumor, so a dental professional must conduct a thorough examination—i.e., an intra oral exam—to arrive at a proper diagnosis. (ECF No. 173 at ¶ 24.) But Dr. Sauter admits that he *cannot* say that Craig did not perform an adequate exam; Sauter can only opine that Craig did not properly document his oral exam. Sauter admits "it would just be speculative" to conclude from a lack of documentation that Craig did not, in fact, thoroughly and adequately examine Bradford. (ECF No. 154, Ex. 8 at 129:1-20.) Further, Sauter said he did not see any evidence—and the Court is not aware of any—that suggests that Craig extracted the wrong tooth or missed something like an infection. (*See* ECF No. 154, Ex. 8 at 1231:6-19.) And even more critically, Sauter—who is a dentist and not an oral surgeon—could not even say for certain that oral surgeons like Craig are held to the same standard for documenting their exams as dentists are. (ECF No. 154, Ex. 8 at 129:23-130:8.) Essentially, Bradford offers Sauter's testimony and Craig's records to argue that Craig failed to take proper notes while examining Bradford. From there, Bradford asks for the inference that Craig, in fact, failed to perform an adequate exam. But again, Sauter admits—and the Court agrees—that such an inference is speculative, and "[i]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Johnson v. Doughty*, 433 F.3d 1001, 1012 (7th Cir. 2006) (quoting *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004)). At most, Sauter offers expert testimony on what constitutes best practices for documenting oral examinations in the field of dentistry and says only that Craig failed to live up to this standard. This cannot support a finding of deliberate indifference.

Bradford's next two complaints—that Craig misdiagnosed the type of wisdom tooth impaction and that Craig did not completely remove his wisdom tooth on February 10—are intertwined and essentially blend into one argument: that Craig fell below the applicable standard of care in extracting Bradford's impacted wisdom tooth. Like his complaint about the intra oral exam, Bradford relies heavily on Sauter's expert testimony to make these arguments. (ECF No. 154, Ex. 8 at 6.) Sauter testified that Craig incorrectly diagnosed Bradford's wisdom tooth as having a "mesioangular impaction," when it was actually "slightly distoangular" or vertical. (*See* ECF No. 154, Ex. 8 at 6.) In layman's terms, Sauter testified that Craig mistakenly diagnosed the tooth as tilted one way, when it was actually tilted the other way or was vertical. Sauter argues this is significant because best practices used to extract a tooth differ based on the type of impaction. In Sauter's expert opinion, because Craig misdiagnosed the impaction, he *could* have used improper methods, and using improper methods *could* have contributed to the fracture of the root tips during the extraction. (ECF No. 154, Ex. 8 at 6.) This evidence does not support a finding of deliberate indifference for two reasons.

First, even assuming Craig's diagnosis was erroneous, it suggests negligence at most. Bradford offers no evidence that the diagnosis was such a "substantial departure from the norm" that it supports a finding of deliberate indifference. *See Davis v. Kayira*, 938 F.3d 910, 915 (7th Cir. 2019) (where defendant misdiagnosed a stroke, there was no evidence suggesting "he knew his diagnosis was wrong" or that "he clearly should have known better").

Second, Sauter's testimony regarding any mistakes Craig may have made in extracting the tooth itself are speculative, and as such, Bradford fails to raise a genuine dispute of material fact as to whether the extraction procedure can support a finding of deliberate indifference. In support of his motion, Craig offered the expert testimony of Dr. Michael Sullivan, who opines that Craig's

extraction conformed to the applicable standard of care and that the impaction type does not affect the surgical procedure for removing a wisdom tooth whatsoever (nor did Craig's diagnosis actually negatively impact Bradford's procedure). (ECF No. 154, Ex. 6 at 11-12; *see also* ECF No. 154, Ex. 4 at 86:17-88:23.) In response, Bradford offers Sauter's testimony that, generally speaking, the impaction type determines how an oral surgeon approaches "sectioning" a tooth (i.e., splitting a tooth into parts and extracting each part separately). The problem for Bradford is that Sauter could not testify that Craig sectioned Bradford's tooth incorrectly or that Craig's impaction diagnosis had any negative impact on how Craig actually extracted Bradford's tooth. (ECF No. 154, Ex. 8 at 76:8-20.) Likewise, Sauter could not testify that anything Craig did during the procedure caused the root tips to fracture. Sauter could only testify that a failure to use "best practices [in removing a tooth] could have contributed to the fracture of the root tips," (ECF No. 154, Ex. 8 at 126:21-16) but again, Sauter could not testify—and Bradford presents no other evidence—that Craig in fact failed to use "best practices" in removing the tooth.[4] In essence, Bradford argues the extraction should have been done differently but has produced no evidence as to what a "better" extraction would look like or what precisely Craig did incorrectly;[5] again, this is speculative and fails to create any genuine dispute of material fact. *See Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1034 (7th Cir. 2019) (granting summary judgment where plaintiff argued he should have received better treatments for back pain and noting that the "lack of

---

[4] Indeed, Dr. Sullivan and Dr. Glenn Scheive testified that root tips can fracture during extraction absent negligence, and Dr. Sullivan's report notes that fractured root tips occur during about 20 percent of extractions. (ECF No. 154, Ex. 7 at 29:15-20, 32:2-11 and Ex. 6 at 12.) Although Dr. Sauter testified he was "shocked" by the statistics offered by Dr. Sullivan, he did not disagree with the figures or disagree that fractured root tips can occur without negligence. (ECF No. 154, Ex. 8 at 136:6-140:14.)

[5] Although Sauter testified that the impaction type affects how a surgeon "sections" a tooth, Sauter could not articulate how the approaches differ or what the proper approach is for a mesioangular impacted tooth, a distoangular impacted tooth, or a vertical tooth. (ECF No. 154, Ex. 8 at 74:1-23.)

evidence of what the 'better' treatments were and whether they would have been effective would leave a jury entirely to its own imagination about what could have been done. Such unmitigated speculation cannot defeat summary judgment").

Finally, the Court addresses Bradford's complaints regarding Craig's use of local anesthesia during the extraction. The parties agree that, in general, it is acceptable to use local anesthesia during a procedure to extract a wisdom tooth. (ECF No. 161 at ¶¶ 16 and 18.) Craig used local anesthesia. In his complaint, Bradford says that Craig did not properly administer the anesthesia which made the tooth extraction "sheer agony," and Bradford now argues Craig was aware of this agony during the procedure and was deliberately indifferent to it. (ECF No. 154, Ex. 1 at ¶ 20.) Indeed, if Craig knew the local anesthesia was not effective and nevertheless proceeded with the extraction, a jury could surely find that Craig was deliberately indifferent. But the problem is Bradford has failed to offer evidence that would support a finding that Craig knew the local anesthesia was not effective and that Bradford was suffering during the extraction.

Bradford only offers two pieces of evidence in support of his position. First, Bradford testified that, even though he was given local anesthesia, the procedure was "very rough" and involved Craig "scrap[ing] my mouth, ripping my mouth open too far, cut[ting] the corners of my mouth…using a lot of brute strength and a lot of unnecessary…pushing down on my jaw and my neck and everything." (ECF No. 154, Ex. 5 at 85:24-86:12.) Second, Bradford offers the testimony of Dr. Glenn Scheive, an oral surgeon who was asked to review paragraph 20 of Bradford's complaint which describes the tooth extraction as "sheer agony." Dr. Scheive testified that it would not be typical for a patient to experience that type of pain if local anesthesia was administered properly, and he was asked if, hypothetically, a patient *was able to voice* that he was "in sheer agony during a wisdom tooth extraction after receiving local anesthesia" whether Dr. Scheive

would take steps to reduce the patient's pain like providing more anesthesia. Responding to the hypothetical, Dr. Scheive said he would "retrace his steps" and might provide additional anesthesia. (ECF No. 154, Ex. 7 at 49:19-50:20.)

Again, the problem with this evidence is that it does nothing to show that—assuming Craig did apply the anesthesia incorrectly—Craig was aware of this fact. There is nothing to suggest Bradford told Craig he was in severe pain or acted in a manner that should have alerted Craig that this was the case. In essence, Bradford testifies that the procedure was very painful, and from that testimony alone, he asks that a jury infer that: (1) Craig administered the local anesthesia incorrectly; (2) Craig became aware of that fact during the procedure; and (3) Craig disregarded that fact and continued to extract the tooth knowing that Bradford was in pain. The Court thinks these inferences are unreasonable. *McDonald*, 371 F.3d at 1001 (in explaining summary judgment standard, noting "we are not required to draw every conceivable inference from the record").[6]

In the end, when viewing the totality of the care Craig provided, Bradford offers evidence that shows, at most, Craig may have committed malpractice. *Petties*, 836 F.3d at 729 (noting a court must "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference"); *Snipes*, 95 F.3d at 591 (observing same). Without speculating or drawing inference upon inference, Bradford has not offered sufficient evidence from which a reasonably jury could infer Craig "knew he was providing deficient treatment." *Petties*, 836 F.3d at 726. "As the 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific,

---

[6] Even assuming Craig knew Bradford was in some pain during the procedure, the Seventh Circuit has suggested that the decision of how best to administer anesthesia (which includes balancing certain risks to the patient's health) "is for [medical professionals] to decide free from judicial interference, except in the most extreme situations." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (granting summary judgment where doctor decided to remove toenail without administering any anesthesia). Regardless, again, Bradford fails to offer evidence from which a jury could reasonably infer Craig was aware Bradford was in pain.

admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). Bradford has failed to do so with respect to Craig.

### B.     Dr. Mitchell

Next, the Court turns to Defendant Mitchell's treatment of Bradford. Although Mitchell treated Bradford on multiple occasions relating to his wisdom tooth, the parties agree that only two visits are at issue here: February 17, 2015, and February 23, 2015. (ECF No. 168 at ¶ 8.) Like Craig, Mitchell argues that there is insufficient evidence upon which a jury could find Mitchell was deliberately indifferent. In response, Bradford argues that he has put forth evidence to show that Mitchell was deliberately indifferent in two ways: (1) Mitchell failed to document an adequate "intra oral exam," and (2) Mitchell did not provide adequate pain medication to Bradford during either visit. (Pl.'s Resp., ECF No. 163 at 5-8.)[7] In these two ways, Bradford argues, Mitchell was deliberately indifferent to the pain Bradford was experiencing from his wisdom tooth.

For the same reasons discussed above with respect to Craig, Bradford's complaint that Mitchell failed to adequately document an intra oral exam cannot support a finding of deliberate indifference. Again, Bradford offers Dr. Sauter's expert testimony that documenting an intra oral exam is part of performing a proper exam because it shows a patient's issue was properly diagnosed; Sauter testified that because Mitchell did not adequately document her exam of Bradford, we can infer that Mitchell did not perform an adequate intra oral exam and therefore failed to fully investigate Bradford's complaints of pain. (ECF No. 168, Ex. 4 at 222:3-223:2.) However, again, Sauter admits that he cannot *actually* say that Mitchell performed an inadequate intra oral exam. (ECF No. 168, Ex. 4 at 223:1-226:3.) It is undisputed that Mitchell did *some sort*

---

[7] Bradford does not claim that Mitchell was otherwise deliberately indifferent in treating him, so the Court will not examine any other aspect of Mitchell's treatment. (*See generally* ECF Nos. 163 and 168.)

of physical exam during both visits and asked Bradford about his condition, his symptoms, and his medications. (*See* ECF No. 170 at ¶¶ 27 and 55; *see also* ECF No. 143, Ex. C at 56:24-55:14.) Thus, the evidence that Mitchell failed to adequately document an intra oral exam cannot support a finding of deliberate indifference because it requires an inference that, at bottom, is only supported by speculation. *Doughty*, 433 F.3d at 1012.

Regarding the pain medication, Bradford essentially argues that Mitchell was deliberately indifferent to the pain he was suffering after his wisdom tooth was pulled because she continued to prescribe Motrin—the same pain medication Craig had prescribed following the February 10 surgery—instead of Tylenol 3, which is a stronger pain medication that Mitchell could have prescribed had she wanted to do so, or some other pain medication stronger than Motrin. Bradford does not make clear how he thinks these facts could support a finding of deliberate indifference, but the Court sees two possibilities: Mitchell's failure to prescribe a stronger pain medication evidences deliberate indifference either because Mitchell "persisted in a course of treatment [she knew] to be ineffective" or because her decision "departed so radically from accepted professional judgment, practice, or standards that a jury may reasonably infer that the decision was not based on professional judgment." *See Whiting*, 839 F.3d at 662-63.

Regarding the effectiveness of Michell's treatment, Bradford's argument ignores certain critical undisputed facts. First, at the February 17, 2015 appointment, Mitchell did not merely continue the existing prescription for Motrin 400 mg. Rather, she *doubled* the dosage of the pain medication—from one to two tablets to be taken at least three times per day. Further, the record shows that Mitchell addressed Bradford's complaints of pain in at least two other ways during the first appointment: (1) she prescribed Methocarbamol 750 mg to address Bradford's complaints of muscle pain and spasms and (2) she placed a "ZOE pellet" where the wisdom tooth was extracted,

which was aimed at reducing the pain Bradford was experiencing as a result of dry socket. In other words, Mitchell did not persist in the same course of treatment Craig had prescribed but took additional steps to better address the pain Bradford said he was experiencing.[8]

At the February 23, 2015 appointment, Bradford told Mitchell he was still experiencing pain at the extraction site. Mitchell prescribed Bradford penicillin for inflammation she observed, but she did not write a new prescription for pain medication because the prescription she wrote on February 17 had not yet expired. Bradford argues these two facts alone are enough to defeat summary judgment, i.e., Bradford said he was in pain and Mitchell did not modify his pain medication but rather persisted in a course of treatment she knew to be ineffective. Even considering only these facts, it is common sense that, even with adequate pain medication, Bradford would still experience some pain or discomfort until the problematic root tips were removed, and the Eighth Amendment does not require that Bradford be kept literally "pain free" while waiting for follow-up surgery. *See Snipes*, 95 F.3d at 592 ("To say the Eighth Amendment requires prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment would be absurd."). But more importantly, Bradford again ignores critical facts that make any inference of deliberate indifference here unreasonable.

First, Bradford ignores the "totality of [Mitchell's] care." *Petties*, 836 F.3d at 729. For example, Bradford ignores the fact that Mitchell had referred him to an outside oral surgeon on an urgent basis to have the retained root tips removed—i.e., addressing what Mitchell believed was a root cause of Bradford's pain—and that Mitchell knew on February 23 that Bradford was

---

[8] The parties dispute whether Mitchell made a comment to Bradford during the February 17 visit that he would have to "live with the pain" until his root tips could be removed. (*Compare* ECF No. 143, Ex. C at 36:10-17; *with* ECF No. 143, Ex. D at 66:13-17.) However, this disputed fact is not enough to create a genuine dispute of material fact. Even if Mitchell did make such a comment, she still took multiple steps thereafter to address Bradford's pain, namely doubling the dosage of his pain medication.

scheduled for follow-up surgery on February 26, 2015. As such, it is a stretch to say that Mitchell

was "doggedly persisting in a course of treatment known to be ineffective" by failing to modify

the pain medication on February 23. *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (persisting

in same course of treatment for year-and-a-half); *see also Goodloe v. Sood*, 2020 WL 255318 at

*3 (7th Cir. Jan. 17, 2020) (persisting in same course of treatment for more than a year); *Wilson v.

Wexford Health Sources, Inc.*, 932 F.3d 513, 521 (7th Cir. 2019) (finding jury question existed

whether doctor was deliberately indifferent in light of plaintiff periodically reporting pain over 14-

month period).

Even more importantly, it is undisputed that on February 23, Mitchell asked Bradford

specifically if he needed any medications, and Bradford admits he did not ask for a different pain

medication or for more Motrin nor did he tell Mitchell that the increased dosage of Motrin was

ineffective in treating his pain. In light of these facts, the Court thinks an inference that Mitchell

was aware on February 23 that the prescribed medication was ineffective is an unreasonable one,

and a fact finder would have to draw this inference to find Mitchell was deliberately indifferent.

*See Farmer*, 511 U.S. at 844 (noting there must be evidence that a defendant in Eighth Amendment

claim had actual knowledge of serious medical need because without such knowledge, defendant

"cannot be said to have inflicted punishment"). Again, in light of the foregoing, the lone fact that

Bradford reported some pain on February 23 is not enough to defeat summary judgment.

Further, Bradford has not offered sufficient evidence to draw the inference that Mitchell's

decision to prescribe Motrin over Tylenol 3 (or some other stronger pain medication) "departed so

radically from accepted professional judgment" as to evidence deliberate indifference. *Whiting*,

839 F.3d at 662-63. First, the fact that Bradford thinks he should have gotten one medication over

another cannot support a finding that Mitchell was deliberately indifferent because Bradford "has

no right to [a] preferred course of treatment." *Grund v. Murphy*, 736 F. App'x. 601, 604 (7th Cir. 2018). Further, the evidence shows that, at best, the question of whether Mitchell should have prescribed Tylenol 3 instead of Motrin 400 mg comes down to a matter of opinion. Mitchell testified that she believes that Motrin is better than Tylenol 3 at treating pain from a tooth extraction and from dry socket. Bradford's own expert, Dr. Sauter, testified that Motrin 400 mg can be effective for pain from an impacted wisdom tooth, and that different doctors have different preferences when it comes to pain medication. Further still, although Dr. Scheive (who removed Bradford's root tips) testified he prefers Tylenol 3, he did not suggest that prescribing Motrin to patients generally—or to Bradford specifically—fell below the applicable standard of care. (ECF No. 168, Ex. 2 at 44:19-45:1.) Indeed, Mitchell had diagnosed Bradford with dry socket (caused by a lack of blood clot at the extraction site), and Mitchell testified that Motrin promotes bleeding better than Tylenol 3 (testimony which Bradford does not rebut or otherwise address). (ECF No. 143, Ex. D at 42:18-43:11, 46:12-19.) Considering this evidence, there is no evidence suggesting that Mitchell's decision to prescribe Motrin 400 mg was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that [Mitchell] actually did not base the decision on her professional judgment." *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1072-73 (7th Cir., 2012) (granting summary judgment on Eighth Amendment claim where doctor prescribed Ibuprofen for pain stemming from plaintiff's medical condition even though plaintiff had previously been prescribed stronger painkiller, Oxycontin, for condition). Rather, at most, Mitchell's decision to prescribe Motrin over Tylenol 3 amounts to "a difference of opinion among medical professionals" and cannot constitute deliberate indifference. *Zaya*, 836 F.3d at 805. Thus, Bradford has not offered sufficient evidence from which a reasonably jury could infer Mitchell "knew [s]he was providing deficient treatment." *Petties*, 836 F.3d at 726.

## II.  *Monell* Claim

Finally, the Court turns to Bradford's *Monell* claim against Defendant Wexford. Although § 1983 has been interpreted to bar *respondeat superior* liability, a defendant like Wexford can be held liable if it has a policy or practice that causes a constitutional violation. *Monell v. Dept. of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978); *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (observing *Monell* extends to private entities like Wexford). To establish his *Monell* claim, Bradford must ultimately prove that an (1) official Wexford policy, (2) a widespread custom or practice, or (3) an action by a Wexford official with policy-making authority was the "moving force behind his constitutional injury." *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016); *see also McCormick v. City of Chi.*, 230 F.3d 319, 324 (7th Cir. 2000). Here, Bradford pursues *Monell* liability under the first two theories. Bradford argues that Wexford's official dental policies are deliberately indifferent in that they fail to protect inmates like him who experience dental emergencies. Bradford also argues Wexford has at least two widespread practices that are deliberately indifferent to his (and other prisoners') serious dental needs. Before addressing each theory, the Court first turns to a threshold issue of whether it can consider an outside expert report offered by Bradford as evidence in support of his *Monell* claim.

### A.  *Lippert* Report

In responding to Wexford's motion for summary judgment, Bradford cites to a report created by court-appointed experts in another case, *Lippert v. Godinez*, 1:10-cv-04603. (*See generally* ECF No. 170, Ex. 4.) The *Lippert* report was created in December 2014—roughly the same time as the events giving rise to Bradford's claims—and reviews medical care provided at the Stateville Correctional Center as well as other Illinois Department of Corrections facilities. As Bradford points out in his response, the *Lippert* report undoubtedly offers support to his argument

that the dental care he received was not an isolated event but rather part of a pattern of conduct. (Pl.'s Resp., ECF No. 169 at 7-10; *see also* ECF No. 170, Ex. 4 at 77-78.)

However, Wexford moves to strike all references to the *Lippert* report, arguing that it constitutes inadmissible hearsay and thus cannot be considered in support of Bradford's opposition to summary judgment. (Wexford's Reply, ECF No. 176 at 1-2.) As Wexford points out, several district courts have declined to consider the *Lippert* report in support of Eighth Amendment claims. *Boyce v. Wexford Health Sources, Inc.*, No. 15 C 7580, 2017 U.S. Dist. LEXIS 61655, at *13-16 (N.D. Ill. Apr. 24, 2017) (collecting cases and finding *Lippert* report to be inadmissible hearsay in ruling on summary judgment); *Mathis v. Carter*, No. 13 C 8024, 2017 U.S. Dist. LEXIS 1156, at *13-15 (N.D. Ill. Jan. 5, 2017) (finding *Lippert* report did not meet hearsay exception for public records and granting summary judgment); *Diaz v. Chandler*, No. 14 C 50047, 2016 U.S. Dist. LEXIS 35450, at *38-41 (N.D. Ill. Mar. 18, 2016) (declining to take judicial notice of *Lippert* report and granting motion to strike report in deciding summary judgment); *Perez v. Wexford Health Sources, Inc.*, No. 17 C 8386, 2019 U.S. Dist. LEXIS 192347, at *22-24 (N.D. Ill. Nov. 6, 2019) (noting "courts have repeatedly held that the Lippert Report is inadmissible and may not be used to defeat summary judgment" and holding same); *Thomas v. Studer*, No. 16 C 8718, 2018 U.S. Dist. LEXIS 178788, at *14 n.1 (N.D. Ill. Oct. 17, 2018) (finding *Lippert* report inadmissible and granting summary judgment); *Page v. Obaisi*, 318 F. Supp. 3d 1094, 1097 n.2 (N.D. Ill. 2018) (noting "[f]or the purposes of summary judgment, the [*Lippert*] report is inadmissible hearsay"). Likewise, on at least one occasion, the Seventh Circuit has ruled the *Lippert* report constitutes inadmissible hearsay. *See Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 522 (7th Cir. 2019) (affirming district court's decision to bar *Lippert* report from trial as inadmissible hearsay).

Bradford is not required to present evidence in an admissible form to escape summary judgment, but Bradford must be able to show that the *Lippert* report is "admissible in *content*," i.e., that he *could* present the contents of the report in some admissible form at trial. *Winskunas v. Burnbaum*, 23 F.3d 1264, 1267-68 (7th Cir. 1994); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); Fed. R. Civ. P. 56(c)(2). Bradford has failed to make such a showing. In opposing Wexford's motion, Bradford apparently asserts that he intends to use the report itself as evidence and acknowledges that its admissibility is an issue. (*See* ECF No. 169 at 4.) But Bradford fails to explain how the contents of the *Lippert* report are admissible, and in light of the decisions cited above, the Court cannot see how Bradford could make such a showing.[9] As such, the Court disregards the *Lippert* report in considering Bradford's *Monell* claim.

## B.     Official Policy

Bradford first argues that, at the very least, there is a genuine dispute of fact whether Wexford's written policies caused the violation of his Eighth Amendment rights. More specifically, Bradford argues that the controlling policies fail to ensure that inmates suffering from dental emergencies are treated in a timely manner, thereby evidencing Wexford's deliberate indifference. (ECF No. 169 at 5-7.) Ultimately, Bradford's argument must fail because the evidence shows that the policies themselves did not *cause* any injury to Bradford.

As described above, Wexford's dental policies state that inmates seeking dental treatments submit request forms so that their needs can be prioritized, and treatment scheduled accordingly. (ECF No. 170, Ex. 2 at 76.) Once request forms are submitted, the policies state that the request,

---

[9] The Court "has no obligation to research and construct [Bradford's] legal arguments" on admissibility here. *Vakharia v. Little Co. of Mary Hosp. & Health Care Ctrs.*, 62 F. App'x 122, 124 (7th Cir. 2003). But in addition to the inadmissibility of the report itself, the Court also notes that, at this point, Bradford would likely be unable to call the authors of the *Lippert* report as witnesses at trial, given that the deadline for the parties' Fed. R. Civ. P. 26(a)(2) expert disclosures has passed.

along with the inmate's dental chart and medical history, should be reviewed to determine the priority level of the request "according to site-specific written protocol." (ECF No. 175 at ¶ 4.) This review is a triage process performed by IDOC nursing staff; the parties dispute how involved Wexford is in performing this process, but it is undisputed that nursing staff *can* consult with Wexford employees in prioritizing cases. (ECF No. 175 No. ¶ 1.)[10] The policies specifically state that "emergency care receives the top priority" and care for inmates with dental emergencies "shall be available at all times" and are to be "scheduled before anyone else on a daily clinical basis." (ECF No. 175 at ¶ 3.) Further, the dental policies characterize "relief of severe pain" as a condition requiring emergency dental care. (ECF No. 170, Ex. 2 at 76.) But Wexford's policy is also to defer to any IDOC policy, and in relevant part, IDOC policy states that any inmate experiencing a dental emergency "shall receive a dental examination no later than the next working day after the emergency occurs." (ECF No. 175 at ¶ 6.)

The gist of Bradford's argument is as follows: in deferring to IDOC policy, it was Wexford's policy that an inmate suffering a dental emergency be seen "no later than the next working day after the emergency occurs." Bradford's expert, Dr. Sauter, opines this shows deliberate indifference because it could lead to a situation where a patient experiencing an emergency—like a deadly infection—is not seen "for three days or more" (assuming the emergency occurs before a weekend, holiday, etc.) (ECF No. 169 at 6.) Further, Sauter testifies that on two occasions—December 29, 2014 and February 6, 2015—Wexford received medical requests from Bradford in which he stated he was suffering severe pain. Sauter testified these medical requests qualified as emergencies, but in each instance, Bradford was not seen for multiple days after Wexford had received his request. Based on these facts, Bradford argues a jury could

---

[10] Again, the record appears to be silent whether there is any relevant policy directly addressing how and by whom request forms are collected.

find that Wexford's policies caused him to go days without treatment, thereby showing that Wexford was deliberately indifferent to Bradford's severe pain.[11]

Even assuming Bradford's medical requests qualified as emergencies, there is at least one problem with Bradford's argument: the timeline shows that Bradford's treatment *actually violated* Wexford's official policies. It is undisputed Bradford's first medical request was received by December 29, 2014 and that he was not seen until January 5, 2015. Likewise, it is undisputed that Bradford's second medical request complaining of pain was received on February 6, 2015 and that he was not seen until February 10, 2015. In each instance, more than one working day passed before Bradford was examined, i.e., Wexford's policies were not followed.[12] As such, even assuming that Wexford's official polices are unconstitutional, no reasonable jury could find that Wexford's official policies *caused* Bradford's Eighth Amendment rights to be violated. *See Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 305-06 (7th Cir. 2010) (noting "we have always required plaintiffs to show that their injuries were caused by the policies or practices complained of").[13]

---

[11] Bradford does not point to any other instances of delays in his treatment in making his argument. (*See generally* ECF No. 175; *see also* ECF No. 169 at 5-7.)

[12] The Court takes judicial notice that: (1) December 29, 2014 was a Monday; (2) January 5, 2015 was a Monday; (3) February 6, 2015 was a Friday; and (4) February 10, 2015 was a Tuesday. *See Ennenga v. Starns*, 677 F.3d 766, 773-74 (7th Cir. 2012); *see also Smith v. Cty. of Racine*, No. 05 C 871, 2007 U.S. Dist. LEXIS 65235, at *6 n.6 (E.D. Wis. Sep. 4, 2007) (taking judicial notice that date fell on particular day of the week).

[13] In making his argument that Wexford's official policies are unconstitutional, Bradford makes other points like that the policies are unconstitutionally vague or that Wexford's dental policies—by their own terms and not by incorporating IDOC policy—can cause impermissible delays for treatment of an emergency. To the extent these are separate arguments, the Court finds them underdeveloped and unsupported by legal authority; as such, they are deemed waived. *Judge v. Quinn*, 612 F.3d 537, 556 (7th Cir. 2010).

### C.        Widespread Custom or Practice

In addition to Wexford's official policies, Bradford also argues that Wexford has unofficial or unwritten practices and customs that violated his Eighth Amendment rights. Again, Bradford can succeed on a *Monell* claim if he can show he was injured by a Wexford "practice or custom that, although not officially authorized, is widespread and well settled." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303-06 (7th Cir. 2010). Under this theory, Bradford must show that Wexford policymakers were "deliberately indifferent as to the known or obvious consequences" of the custom or practice. *Id.* at 303. ("In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff."). Plaintiffs commonly prove deliberate indifference by showing a pattern of conduct that allows a jury to conclude that the policymakers were on notice of the custom or practice; the key is that "the plaintiff must demonstrate that there is a policy at issue rather than a random event." *Id.* (noting there are no "bright-line rules" for establishing a widespread custom or practice but that there "must be more than one instance…or even three"). For present purposes, "to survive summary judgment, a plaintiff need not present a full panoply of statistical evidence showing the entire gamut of a defendant's past bad acts to establish a widespread practice or custom. Instead, it is enough that a plaintiff present competent evidence tending to show a general pattern of repeated behavior (*i.e.,* something greater than a mere isolated event)." *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006).

Wexford argues that Bradford has failed to present evidence that shows any sort of pattern or practice that caused Bradford injury or that shows the requisite deliberate indifference. Bradford responds that Wexford had two practices that violated his Eighth Amendment rights: (1) an unofficial practice of delaying access to dental care to patients experiencing urgent needs or

emergencies and (2) a practice or custom of providing completely inadequate dental care. (ECF No. 169 at 10-13.)[14]

The Court finds Bradford fails to present sufficient evidence to create a jury question whether these practices existed. Without the *Lippert* report, Bradford offers only his own experience in the form of his testimony, his medical records, and the expert testimony of Dr. Sauter, who opines that the treatment relating to Bradford's wisdom tooth amounted to deliberate indifference. Thus, at bottom, Bradford points to one instance—the treatment he received—as evidence of each of the unofficial practices he complains of, and that is insufficient to show the requisite "series of bad acts" from which a jury could infer Wexford's deliberate indifference. *See Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 796 (7th Cir. 2014) (affirming summary judgment where plaintiff could only point to his own experiences and finding "[s]uch isolated incidents do not add up to a pattern of behavior that would support an inference of a custom or policy, as required to find that Wexford as an institution/corporation was deliberately indifferent to Shields' needs"); *see also Perez*, 2019 WL 5788073 at *8 (granting summary judgment in favor of Wexford where plaintiff "failed to present evidence outside of his own experience").

Some plaintiffs like Bradford have escaped summary judgment on *Monell* claims where, even though they do not present a pattern of specific instances of similar misconduct, they do offer testimony or circumstantial evidence generally showing deficiencies in treatment from which an

---

[14] In his response, Bradford also refers to Dr. Sauter's expert report and notes that Wexford staff failed to follow the prescription orders given by Dr. Scheive, a failure that comports with a finding in the *Lippert* report. (ECF No. 169 at 9-10.) To the extent that Bradford proposes this constitutes another practice that can support a *Monell* claim, the Court again finds this underdeveloped. Moreover, Bradford fails to include the underlying facts in his Local Rule 56.1 statement, and thus, the Court will not consider this argument. *Curtis*, 807 F.3d at 219 (noting rule that parties "comply strictly" with Local Rule 56.1); *see also Gonzalez v. Taylor*, No. 14 C 4366, 2019 U.S. Dist. LEXIS 33439, at *1 n.3 (N.D. Ill. Mar. 4, 2019) ("The Court does not consider any facts that parties failed to include in their statements of fact, because to do so would rob the other party of the opportunity to show that the fact is disputed.")

unofficial practice can be inferred. *See e.g., Davis v. Carter*, 452 F.3d 686, 695 (7th Cir. 2006) (denying summary judgment where, in addition to personal experience, plaintiff offered jail employee testimony about systematic delays in treatment and delays inherent in treatment procedures); *Daniel v. Cook Cty.*, 833 F.3d 728, 735 (7th Cir. 2016) (noting testimony from jail medical staff describing various inadequacies of Cook County jail health care). But Bradford has failed to produce similar evidence here, especially regarding his first theory.

Most notably, there is a lack of evidence showing how, in practice, medical request forms are processed. As such, it is not entirely clear what Wexford's role is in these processes. In particular, the Court notes that the parties dispute whether—and to what extent—Wexford staff is involved in collecting medical request forms and ensuring they are reviewed in a timely fashion. (ECF No. 175 at ¶ 1.) As mentioned above, there is no evidence in the record of an official policy on the subject. Bradford points to the testimony of Wexford's corporate representative, Dr. Fisher, who testified that "Wexford Health staff may be involved in collecting requests that can be submitted." (ECF No. 175 at ¶ 1.) While a fact finder may be able to infer from this testimony that Wexford was involved in the delay between the time Bradford submitted his requests and when he was treated, this testimony is not enough to support an inference that Wexford had a practice of delaying the collection and review of medical request forms. The delays that Bradford complains of are indeed troubling, but again, summary judgment is the "'put up or shut up' moment in a lawsuit," and as the party who ultimately bears the burden of proof, Bradford must do more to create a genuine dispute of material fact. *Grant*, 870 F.3d at 568. Even drawing all reasonable inferences in favor of Bradford, the Court thinks there is insufficient evidence for a jury to say that there were actual customs or practices at work here. *See Gaston v. Ghosh*, 920 F.3d 493, 495-96 (7th Cir. 2019) (affirming summary judgment on *Monell* claim alleging delayed treatment and

noting gaps in evidence like "*who* was responsible for the delays (the four physicians named as defendants? back-office staff? someone else?) or *why* those delays occurred (a desire for [plaintiff's] pain continue? indifference to his pain? simple negligence? medical judgment?)").[15]

Finally, Bradford argues that he has presented sufficient evidence for a jury to find he has proved his *Monell* claim under a *respondeat superior* theory. (ECF No. 169 at 13-15.) The Court notes that Bradford makes this argument for purposes of preserving it for a potential appeal. In *Iskander v. Forest Park*, the Seventh Circuit held that private corporations like Wexford are not subject to vicarious liability in § 1983 actions. 920 F.3d 493, 494 (7th Cir. 1982). The Seventh Circuit has questioned whether it should revisit *Iskander*'s holding but have not yet formally done so. *See Shields*, 746 F.3d at 789-96 (discussing rationale for *respondeat superior* liability of private corporation under *Monell*); *Wilson*, 932 F.3d at 522 (noting Seventh Circuit has so far "chosen to leave *Iskander* undisturbed"). As such, this Court is still bound by *Iskander*, and Bradford's *Monell* claim cannot proceed under a theory of *respondeat superior* liability.

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment [135, 141, and 145] are granted. Civil case terminated.

**SO ORDERED.**                            **ENTERED: February 6, 2019**

**HON. JORGE ALONSO**
**United States District Judge**

---

[15] In addition to being limited to his own experience, Bradford's second theory—that Wexford had a practice of providing substandard care—also fails because, as discussed above, the Court concludes that no reasonable jury could find that the care provided Bradford amounted to deliberate indifference. To the extent Bradford supports this theory with evidence of the care provided by Dr. Mary Cavitt, the Court's analysis regarding Craig and Mitchell applies with equal force to Bradford's criticisms of Dr. Cavitt.